IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAVID WAYNE HALL,                    :

    Plaintiff,                           :

v.                                   :          Civil Action No. GLR-15-1008

J. MICHAEL STOUFFER, et al.,         :

    Defendants.                          :

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants J. Michael Stouffer and Dayena M. Corcoran's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 33). Also pending before the Court is Plaintiff David Wayne Hall's Motion for Leave to File Surreply in Opposition to Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 42). In this 42 U.S.C. § 1983 (2018) action, Hall, a Maryland inmate housed in Virginia, alleges that he has been deprived of access to Maryland courts because he cannot obtain Maryland legal materials or legal assistance. The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2016). For the reasons that follow, the Court will deny in part and deny without prejudice in part Defendants' Motion and grant in part and deny in part Hall's Motion for Leave to File Surreply.

# I.    BACKGROUND[1]

## A.    Factual Background

### 1.    Hall's Criminal Case

In March 1992, the Circuit Court for Baltimore County, Maryland sentenced Hall to a term of life imprisonment plus fifteen years for committing several felonies.  (1st Am. Compl. ¶ 9, ECF No. 25).  In August 1996, Hall agreed to be a cooperating witness in two state-court first-degree murder cases.  (Id. ¶ 10).  In exchange for his testimony, the State agreed to several conditions, including receiving a letter from an Anne Arundel County State's Attorney regarding Hall's cooperation, which was to be placed in his parole file.  (Id.).  The State's Attorney wrote the letter.  (Id. ¶ 11).

In June 2006, Hall had his first parole hearing.  (Id. ¶ 15).  The Parole Board did not consider that he was a cooperating witness.  (Id.).  The Parole Board did not recommend Hall for parole.  (Id. ¶ 16).  The Parole Board again did not recommend Hall for parole in 2008, 2010, 2012, 2014, and 2016.  (Id.).

### 2.    Attempts to Obtain Maryland Legal Materials

On October 22, 1999, pursuant to the Interstate Corrections Compact ("ICC"), the State of Maryland involuntarily transferred Hall to the Virginia state prison system.  (Id. ¶ 12).  Hall is currently incarcerated at Augusta Correctional Center in Craigsville,

---

[1] Unless otherwise noted, the facts outlined here are set forth in Hall's First Amended Complaint and Demand for Jury Trial ("First Amended Complaint") (ECF No. 25).  To the extent the Court discusses facts that Hall does not allege in his First Amended Complaint, they are uncontroverted and the Court views them in the light most favorable to Hall.  The Court will address additional facts when discussing applicable law.

Virginia.  (Id. ¶ 6).  The ICC requires the State to ensure that inmates like Hall receive the same access to legal materials that inmates housed in Maryland receive.  (Hall Decl. ¶ 12, ECF No. 36-1).[2]  The Maryland Division of Correction ("DOC") publishes a handbook for inmates that contains information regarding requests for legal materials: the "Handbook for Maryland Inmates Housed Out of State Under Interstate Corrections Compact and Intergovernmental Agreements" (the "Handbook").  (Mem. Supp. Mot. Dismiss Summ. J. ["Stouffer's Mot."] Ex. 1 at 15–20 ["Handbook"], ECF No. 4-2).  The Handbook also contains a Library Assistance to State Institutions ("LASI") form, which inmates use to request legal materials.  (Id. at 20; May 18, 2015 Henson-Smith Decl. ¶ 3, Stouffer's Mot. Ex. 1 at 5–8, ECF No. 4-2).  Hall did not receive the Handbook or the LASI request form.[3]  (Hall Decl. ¶ 2).

In January 2008, Hall filed an Informal Complaint with the Virginia Department of Corrections ("VDOC"), requesting access to Maryland legal materials.  (Hall Decl. ¶ 6; Pl.'s Resp. Defs.' Mot. Dismiss Summ. J. ["Pl.'s Opp'n"] Ex. A1 ["Jan. 22, 2008 Inf. Compl."], ECF No. 36-2).  In response, VDOC told Hall to contact the Maryland ICC Coordinator, Yuvonka Jenkins.  (Hall Decl. ¶ 7; Jan. 22, 2008 Inf.

---

[2] Under the ICC, the state receiving a transferred inmate acts "solely as agent" for the sending state, the inmate "shall at all times be subject to the jurisdiction of the sending state," and the inmate shall have all "legal rights which the inmate would have had if confined in an appropriate institution of the sending state."  Md. Code Ann., Corr. Servs. § 8-605(a), (c), (e) (West 2018).

[3] Defendants contend that Hall received a copy of the Handbook when Stouffer filed his Motion to Dismiss or, in the Alternative, Motion for Summary Judgment.  Hall, however, avers that he has not received a copy of the Handbook.  (Hall Decl. ¶ 2, ECF No. 36-1).  Accordingly, there exists a genuine dispute of material fact regarding whether Hall received the Handbook and, if so, when and how.

Compl.). On February 8, 2008, Hall wrote to Jenkins and requested Maryland legal materials, including the Maryland Constitution, Maryland Code Annotated, and Maryland Rules, as well as the ICC contract between Maryland and Virginia.[4] (Hall Decl. ¶¶ 7, 8; Pl.'s Opp'n Ex. A2 at 2 ["Feb. 8, 2008 Hall Ltr."], ECF No. 36-3).[5] Eight months later, on October 22, 2008, Jenkins responded to Hall, stating that he needed to send a check for $1.20 to obtain a copy of Maryland and Virginia's ICC Contract; Jenkins did not address Hall's other requests for Maryland legal materials. (Hall Decl. ¶ 9; Pl.'s Opp'n Ex. A3, ECF No. 36-4).

On September 5, 2008, before he received a response from Jenkins, Hall wrote Sandy Cole at the Maryland Department of Public Safety and Correctional Services ("DPSCS"). (Hall Decl. ¶ 13; Pl.'s Opp'n Ex. A7 ["Sept. 5, 2008 Hall Ltr."], ECF No. 36-8). Hall stated that he sent Jenkins a letter requesting a copy of the ICC Contract and had not received a response. (Sept. 5, 2008 Hall Ltr. at 1). Hall also informed Cole that he sent the Maryland Attorney General a request for a copy of the ICC Contract, and that an Assistant Attorney General responded, letting him know that she had forwarded his letter to Cole. (Id.). Hall indicated that he had not yet received a response from Cole and requested a copy of the ICC Contract. (Id. at 1–2).

---

[4] On February 22, 2008, Hall contacted LexisNexis requesting compact discs with Maryland legal materials. (Hall Decl. ¶ 10; Pl.'s Opp'n Ex. A4, ECF No. 36-5). On March 10, 2008, LexisNexis responded to Hall, informing him that he should contact the ICC Department. (Hall Decl. ¶ 12; Pl.'s Opp'n Ex. A6, ECF No. 36-7).

[5] Hall copied the Maryland and Virginia Departments of Corrections and each State's Attorney General on his February 8, 2008 letter. (Feb. 8, 2008 Hall Ltr. at 2).

On February 11, 2009, Hall wrote Stouffer to inform him that he did not have access to Maryland legal materials and to request that Stouffer provide them for Hall. (Hall Decl. ¶ 14; Pl.'s Opp'n Ex. A8 ["Feb, 11, 2009 Hall Ltr."] at 1–2, ECF No. 36-9; Miller Decl. ¶ 2, ECF No. 41-8). Hall detailed his attempts to obtain Maryland legal materials, including contacting LexisNexis and Virginia's Institutional Attorney. (Feb. 11, 2009 Hall Ltr. at 2). Hall complained that he had "no access to the [f]ederal and [s]tate [c]ourts because I have NO Maryland legal books, NO Maryland law on disk, NO Maryland Institutional Attorney, or Maryland law library." (Id.). Hall further complained that he had "NO Maryland law at all" and that he was "being totally deprived" of his access to the courts. (Id.).

On March 17, 2009, Kendall Gifford, DOC Director of Case Management, responded to Hall's letter on Stouffer's behalf. (Hall Decl. ¶ 15; Pl.'s Opp'n Ex. A9 ["Mar. 17, 2009 Gifford Ltr."], ECF No. 36-10; Miller Decl. ¶ 2). Gifford instructed Hall to send his requests for Maryland legal materials to LASI. (Mar. 17, 2009 Gifford Ltr.). She also told Hall to contact Becky Johnson at DOC Headquarters, Case Management Unit, for further assistance. (Id.).[6]

---

[6] On April 9, 2009, Hall wrote Johnson requesting her assistance in receiving copies of the ICC Contract that he had paid for. (Hall Decl. ¶ 16; Pl.'s Opp'n Ex. A10, ECF No. 36-11). Likewise, on May 23, 2011, Hall wrote Charvette Henson, DOC Case Manager, requesting a copy of the ICC Contract between Maryland and Virginia. (Hall Decl. ¶ 21; Pl.'s Opp'n Ex. A15 ["May 23, 2011 Hall Ltr."] at 1, ECF No. 36-16). Hall indicated that he did not have access to "Maryland laws, codes, statutes, etc." and that he wanted to be transferred back to Maryland. (May 23, 2011 Hall Ltr. at 3).

On an unspecified date, Hall requested from LASI Maryland Rules 2-231 through 2-241, 2-501 through 2-551, 2-601 through 2-652, and 3-401 through 3-431.[7] (See Hall Decl. ¶ 17; Pl.'s Opp'n Ex. A11 ["Nov. 9, 2010 LASI Ltr."], ECF No. 36-12). On November 9, 2010, LASI provided an unsigned, one-sentence reply to Hall's request, stating "we cannot violate copyright laws by photocopying the entire book for you." (Nov. 9, 2010 LASI Ltr.). The November 9, 2010 letter is on Department of Labor Licensing and Regulation ("DLLR") letterhead, but it indicates that it is "From: LASI."[8] (Id.). In response, on December 24, 2010, Hall wrote the DLLR and reiterated his request for the Maryland Rules listed above. (Hall Decl. ¶ 18; Pl.'s Opp'n Ex. A12 ["Dec. 24, 2010 Hall Ltr."] at 1, ECF No. 36-13). He also suggested that LASI send books or computer disks containing the requested legal materials to avoid violating copyright laws. (Decl. 24, 2010 Hall Ltr. at 1). Hall copied Stouffer, among others, on this letter. (Id. at 2). Hall never received a response. (Hall Decl. ¶ 18).

On April 4, 2011, Hall wrote the Maryland Attorney General, informing him that LASI would not provide him with copies of Maryland legal materials because his requests would violate copyright laws. (Hall Decl. ¶ 19; Pl.'s Opp'n Ex. A13 ["Apr. 4, 2011 Hall Ltr."], ECF No. 36-14). Hall also requested certain Maryland Rules. (Apr. 4, 2011 Hall Ltr.). On April 15, 2011, the Office of the Attorney General responded, stating that although it could not provide copies of the Maryland Rules Hall requested, Hall

_____

[7] These Maryland Rules govern certain aspects of Maryland Circuit Court and District Court procedure.

[8] The November 9, 2010 letter also includes a subheading "Division of Workforce Development and Adult Learning Correctional Education Libraries." (Nov. 9, 2010 LASI Ltr.).

could access them on the internet.  (Hall Decl. ¶ 20; Pl.'s Opp'n Ex. A14, ECF No. 36-15).  Hall does not, however, have access to the internet.  (Hall Decl. ¶ 20).

On March 28, 2013, Hall sent Stouffer a Maryland Public Information Act ("MPIA") request.  (Hall Decl. ¶ 22; Pl.'s Opp'n Ex. A16 ["MPIA Req."], ECF No. 36-17).  Hall requested, among other things, "the law, manuals, policies or procedures governing the difference between a 'Life' Sentence and 'The Balance of Natural Life' Sentence."[9]  (MPIA Req. at 11).  On November 15, 2013, Hall filed a lawsuit in the Circuit Court for Baltimore County, Maryland because Stouffer and others had failed to respond to his MPIA request.  (Defs.' Mot. Dismiss Summ. J. ["Defs.' Mot."] Ex. 7, ECF No. 33-11).  Nearly a year and a half after filing his MPIA request, on August 8, 2014, Renata Seergae of DPSCS responded.  (Hall Decl. ¶ 23; Pl.'s Opp'n Ex. A17 ["Aug. 8, 2014 Seergae Ltr."], ECF No. 36-18).  She indicated that DOC did not have a record of receiving Hall's March 28, 2013 MPIA request until July 17, 2014.  (Aug. 8, 2014 Seergae Ltr. at 1).  DOC documentation reflects, however, that Stouffer's administrative staff processed Hall's MPIA request on November 15, 2013.  (Mekiliesky Decl. ¶¶ 2–3, ECF No. 45-1).[10]  Seergae informed Hall that his request "calls for the production of

---

[9] On October 30, 2013, Stouffer took a voluntary demotion to become a Warden at Roxbury Correctional Institution.  (Janifer Decl. at 1, ECF No. 33-10; Defs.' Reply at 4, ECF No. 41-3).  Corcoran was DOC's Acting Commissioner of Correction between April 8, 2016 and May 16, 2016, and starting on May 17, 2016, became DOC's current Commissioner of Correction.  (Janifer Decl. at 2).  There is no evidence in the record about who was the Commissioner of Correction between November 1, 2013 and April 7, 2016.

[10] On January 1, 2018, Defendants filed a Supplement to their Motion.  (ECF No. 45).  In the Supplement, they indicate that their attorney "recently learned that documents

hundreds of documents," and that it would cost $655.92 to collect and copy the documents. (Aug. 8, 2014 Seergae Ltr. at 1–2). Seergae further informed Hall that if he paid that amount, she would continue to work on fulfilling his MPIA request. (Id. at 2).[11]

On June 5, 2014, Hall wrote the Institutional Attorney for Augusta Correctional Center, William Little, Esq. (Hall Decl. ¶ 30; Pl.'s Opp'n Ex. A20, ["June 5, 2014 Hall Ltr."], ECF No. 36-21). In his letter, Hall states that he is "trying to challenge my Maryland criminal convictions and fight the Maryland Parole Board. But every time I write to Maryland officials, they either give me the runaround or tell me to get the legal material from you, the Institutional Attorney." (June 5, 2014 Hall Ltr.). Hall indicates that this is his "third request for legal material," but Little has not responded. (Id.). Hall also proposes that instead of meeting with him, Little could send him the Maryland Rules for filing state petitions for habeas corpus and "Maryland parole procedures and laws to challenge the procedures." (Id.). Little never met with Hall or responded to his letter. (Hall Decl. ¶ 30).

### 3. Correspondence with the Maryland Office of the Public Defender

While Hall was attempting to obtain access to Maryland legal materials as described above, he was also corresponding with the Maryland Office of the Public Defender ("OPD"). Hall first wrote Scott Whitney, then-Chief Attorney of OPD's Collateral Review Division. (Hall Decl. ¶ 31; Pl.'s Opp'n Ex. A21 ["Mar. 18, 2008 Hall

---

exist which suggest that DOC had a copy of P's MPIA request in November 2013." (Suppl. at 1, ECF No. 45).

[11] Hall also contacted the Maryland Court of Special Appeals in September 2013 about filing a complaint regarding his MPIA request and expungement of his criminal conviction. (Hall Decl. ¶ 25).

Ltr."], ECF No. 36-22). He told Whitney that "[i]t has been some time since I have heard anything from you, or your office." (Mar. 18, 2008 Hall Ltr. at 1). Hall also detailed his issues with the Parole Board and his attempts to obtain Maryland legal materials. (Id. at 1–2). Whitney responded to Hall on June 6, 2008. (Hall Decl. ¶ 32; Pl.'s Opp'n Ex. A22 ["June 6, 2008 Whitney Ltr."], ECF No. 36-23). Whitney acknowledged that it had been "quite some time" since he had contact with Hall. (June 6, 2008 Whitney Ltr. at 1). Whitney told Hall that due to his caseload, he would be "transferring [Hall's] case to another attorney who would be in a better position to review the transcript that has been provided to [him] by [Hall's] parents" and that the new attorney "will contact [Hall] once he or she takes physical possession of [Hall's] file." (Id.).

Also on June 6, 2008, Norman Handwerger, Deputy Chief of OPD's Collateral Review Division, sent Hall a letter advising him that Handwerger or another attorney from the Collateral Review Division would visit him "as soon as [they] can" but "it could be awhile before [they] can actually see" Hall. (Hall Decl. ¶ 33; Pl.'s Opp'n Ex. A23 ["June 6, 2008 Handwerger Ltr."], ECF No. 36-24). Handwerger advised Hall of the ten-year deadline for filing a petition for post-conviction relief in state court and gave Hall instructions for filing his own petition if he chose to do so. (June 6, 2008 Handwerger Ltr. at 1). Handwerger told Hall that he was "enclosing a copy of Maryland Rule 4-402, which outlines the specific information you must include in your [p]etition." (Id. at 2). Handwerger did not, however, include a copy of Maryland Rule 4-402. (Hall Decl. ¶ 33).

On September 11, 2008, Handwerger responded to correspondence from Hall, informing him that he could not give him an estimate as to when he would visit Hall or

file a petition for post-conviction relief on Hall's behalf. (Hall Decl. ¶ 34; Pl.'s Opp'n Ex. A24 ["Sept. 11, 2008 Handwerger Ltr."], ECF No. 36-25). Handwerger reassured Hall, however, that his case "is very important" to OPD and that OPD was "doing everything [they] can to move it along as quickly as possible." (Sept. 11, 2008 Handwerger Ltr.). Then, on March 5, 2009, Handwerger responded to a letter Hall wrote to OPD's Administrative Services Division regarding a $50.00 outstanding debt. (Hall Decl. ¶ 36; Pl.'s Opp'n Ex. A26, ["Mar. 5, 2009 Handwerger Ltr."], ECF No. 36-27). Handwerger told Hall that "Administrative Fee Agreement money should not come to [his] office directly," and that OPD was "still in the process of trying to obtain transcripts of your trial." (Mar. 5, 2009 Handwerger Ltr.).

On November 2, 2010, Hall wrote OPD. (Hall Decl. ¶ 37; Pl.'s Opp'n Ex. A27 ["Nov. 2, 2010 Hall Ltr."], ECF No. 36-28). This time, he requested Maryland legal materials, including copies of the Maryland Petition for Writ of Habeas Corpus, the affidavit for seeking in forma pauperis status, and Maryland laws governing state petitions for writ of habeas corpus. (Nov. 2, 2010 Hall Ltr.). In response, Brian Saccenti, Deputy Chief Attorney of OPD's Appellate Division, informed Hall that OPD "does not provide legal advice to inmates unless we are currently representing them, and we do not provide forms for inmates to use in representing themselves." (Hall Decl. ¶ 38; Pl.'s Opp'n Ex. A28 ["Nov. 6, 2010 Saccenti Ltr."], ECF No. 36-29). Saccenti told Hall to write Whitney and request representation if he believed that he may "have an issue that could be raised in a post-conviction proceeding." (Nov. 6, 2010 Saccenti Ltr.). Hall then wrote Whitney requesting the same Maryland legal materials he requested in his

November 2, 2010 letter to OPD. (Hall Decl. ¶ 39; <u>Compare</u> Pl.'s Opp'n Ex. A29, ECF No. 36-30, <u>with</u> Nov. 2, 2010 Hall Ltr.). On December 14, 2010, Handwerger, the OPD attorney assigned to Hall's post-conviction case, responded, stating that OPD "is not equipped to provide the services" Hall requested. (Hall Decl. ¶ 40; Pl.'s Opp'n Ex. A30 ["Dec. 14, 2010 Handwerger Ltr."], ECF No. 36-31). Handwerger then listed the Maryland Code provisions and Maryland Rules that govern habeas corpus petitions and explained the difference between habeas proceedings and post-conviction proceedings, which are governed by the Post Conviction Procedure Act ("PPA"). (Dec. 14, 2010 Handwerger Ltr. at 1). Handwerger stated that he had "enclosed a copy of the current parole eligibility statute." (<u>Id.</u> at 2). Handwerger did not, however, enclose a copy of that statute or any of the other Maryland laws he cited. (Hall Decl. ¶ 40).

Hall again wrote Whitney on December 30, 2010. (Hall Decl. ¶ 41; Pl.'s Opp'n Ex. A31, ["Dec. 30, 2010 Hall Ltr."], ECF No. 36-32). Hall explained that Handwerger told him that OPD's Collateral Review Division was "not equipped to provide" Hall with copies of Maryland legal materials. (Dec. 30, 2010 Hall Ltr.). Hall also informed Whitney that although OPD had assigned attorneys to work on his case in 2007–2008, he had "not received any communications" from them. (<u>Id.</u>). Hall requested, among other things, copies of the Maryland Rules and statutes governing habeas corpus petitions and the PPA. (<u>Id.</u>). Hall did not receive a response or any other correspondence from OPD until 2017. (Hall Decl. ¶ 42).

Nearly seven years later, on September 17, 2017, Handwerger wrote Hall informing him that he had "completed his review" of Hall's trial court transcripts.[12] (Hall Decl. ¶ 42; Pl.'s Opp'n Ex. A32 ["Sept. 13, 2017 Handwerger Ltr."], ECF No. 36-33). Handwerger acknowledged that he was aware Hall had "filed a law suit in federal court claiming that Maryland is depriving [him] of access to the courts," and that because Handwerger's name is "mentioned in the pleadings," Hall may want to consult with his attorney first to determine "if [Hall] can or should talk to [Handwerger] about [his] post-conviction case." (Sept. 13, 2017 Handwerger Ltr.). Handwerger emphasized that he did "not intend to talk to [Hall] about any aspect of [Hall's] pending law suit in federal court." (Id.). Rather, he only wanted "to talk about [Hall's] post conviction case." (Id.).

B.     **Procedural Background**

On April 9, 2015, Hall sued Stouffer, alleging that Stouffer had violated Hall's right of access to Maryland courts by failing to provide him with Maryland legal materials. (ECF No. 1). On February 4, 2016, the Court entered an Order denying without prejudice Defendant Stouffer's first Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 8). The Court requested that Stouffer supplement his Motion with information regarding, in relevant part: (1) whether Hall actually received the Handbook; (2) any documentation indicating that Hall received the

---

[12] Handwerger sent his September 13, 2017 letter to Hall after Hall filed an Amended Complaint in this case on August 14, 2017.

Handbook; and (3) all records pertaining to Hall's LASI requests and any responses.[13] (Feb. 4, 2016 Order at 3, ECF No. 8).

On February 16, 2017, the Court denied Stouffer's Motion to Renew Motion for Summary Judgment and appointed counsel for Hall. (ECF No. 17). The Court concluded that Stouffer's supplemented Motion was "still insufficient" to support the entry of summary judgment because there remained significant disputes of material fact. (Feb. 16, 2017 Mem. Op. at 3, ECF No. 17). The Court noted that Stouffer "acknowledges that no documentation has been located" to show that Hall received the Handbook, and "[d]espite that acknowledgement, Defendant continues to point to the [H]andbook to support the argument that [Hall] was aware of and understood the process for obtaining access to Maryland legal materials." (Id.) (citation omitted). In addition, Stouffer was "unable to locate any LASI requests submitted by Hall or any response thereto." (Id.) (citation omitted). The Court further noted that "[w]hile Hall contacted the Office of the Public Defender and received assurances that it would provide him assistance, the record does not demonstrate that any actual assistance was given." (Id. at 4). The Court ultimately found that the "[r]esponses to Hall's requests for legal materials that are in the record demonstrate a lack of any real assistance." (Id.). Because Hall "is

_____

[13] The Court also requested information regarding whether Hall's efforts to grieve his lack of legal materials through Virginia satisfied the exhaustion requirement. (Feb. 4, 2016 Order at 3, ECF No. 8). The evidence as to Hall's exhaustion of administrative remedies demonstrated that although Maryland DOC officials told Hall to utilize Virginia's grievance process, "Hall submitted grievances through several levels of the Virginia grievance procedures and, at each level, was told to contact Maryland." (Feb. 16, 2017 Mem. Op. at 4–5, ECF No. 17). The Court subsequently concluded that Hall had exhausted his available administrative remedies. (Id. at 5).

hampered in articulating the underlying challenges he would mount because of his lack of access to Maryland legal materials," the Court appointed counsel for Hall.  (Id. at 5).

On August 14, 2017, Hall filed a First Amended Complaint and Demand for Jury Trial ("First Amended Complaint").  (ECF No. 25).  In his First Amended Complaint, Hall added Corcoran as a Defendant.  (1st Am. Compl. ¶ 8).  Hall brings a single Count against Stouffer and Corcoran under 42 U.S.C. § 1983 for violations of his First and Fourteenth Amendment Right of Access to the Courts.  (Id. ¶¶ 78–85).  Hall sues Stouffer in his individual capacity and Corcoran in her official capacity.  (Id. ¶¶ 79–80).[14]  He seeks declaratory relief as to both Defendants, monetary damages from Stouffer, and injunctive relief from Corcoran.  (Id. a–f).

On September 18, 2017, Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment.  (ECF No. 33).  Hall filed an Opposition on October 12, 2017.  (ECF No. 36).  On November 9, 2017, Defendants filed a Reply.  (ECF No. 41).  Hall filed a Motion for Leave to File Surreply in Opposition to Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment on November 29, 2017.  (ECF No. 42).  On December 13, 2017, Defendants filed an Opposition.  (ECF No. 44).  To date, the Court has no record that Hall filed a Reply.

---

[14] Though Hall initially brought suit against Corcoran in her individual capacity, in his Opposition, he voluntarily dismisses his claims against Corcoran in her individual capacity, with leave to amend to add the individual capacity claim against Corcoran back if discovery uncovers information that warrants it.  (Pl.'s Opp'n at 28 n.12).  Accordingly, the Court will dismiss Hall's claims against Corcoran in her individual capacity.

## II.    DISCUSSION

## A.    **Motion for Leave to File Surreply**

Hall seeks leave of the Court to file a Surreply that addresses the facts presented in the Stouffer Declaration, which is attached to Defendants' Reply.   Hall also moves to strike the Declaration because it is procedurally improper.   Defendants do not oppose Hall filing a surreply.   They do, however, oppose Hall's request to strike the Stouffer Declaration.  The Court, therefore, only addresses the request to strike.

Hall asserts that Federal Rule of Civil Procedure 6(c)(2) requires that "[a]ny affidavit supporting a motion must be served with the motion."[15]   As a result, the Court should disregard the Stouffer Declaration.  The Court disagrees.

Although the plain language of Rule 6(c)(2) appears to support Hall's argument, courts applying this Rule have adopted a more lenient interpretation.  As this Court has noted, nothing in the Federal Rules of Civil Procedure precludes a movant from submitting affidavits and other evidence that support a reply brief in response to arguments raised in an opposition.  See, e.g., Allen v. Enabling Techs. Corp., No. WMN-14-4033, 2016 WL 4240074, at *4 (D.Md. Aug. 11, 2016); Robinson v. Empire Equity Grp., Inc., No. WDQ-09-1603, 2009 WL 4018560, at *2 (D.Md. Nov. 18, 2009).  Here, the Stouffer Declaration details the procedures Stouffer's administrative staff followed for processing his mail.  The information in the Stouffer Declaration responds to at least two of Hall's Opposition arguments: that there are disputes of material fact regarding whether Stouffer's conduct violated Hall's First and Fourteenth Amendment rights; and

---

[15] Hall mistakenly cites Rule 56(c)(2).

whether Stouffer's deliberate indifference allowed Hall's constitutional rights to be violated. Admittedly, however, the Stouffer Declaration provides new evidence to which Hall should be permitted to respond—and he does so in his proposed Surreply.

The Court will, therefore, deny Hall's request to strike the Stouffer Declaration and grant his Motion for Leave to File Surreply.

## B. **Motion to Dismiss or, in the Alternative for Summary**

### 1. **Conversion of Defendants' Motion**

Defendants style their Motion as a motion to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56. A motion styled in this manner implicates the Court's discretion under Rule 12(d). See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice

and a reasonable opportunity for discovery. See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005). The Court "does not have an obligation to notify parties of the obvious." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 261 (4th Cir. 1998).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d). A Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine

issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 953 (4th Cir. 1995)).

Here, both parties present evidence outside of the First Amended Complaint and Hall did not submit a Rule 56(d) affidavit or otherwise oppose converting Defendants' Motion. Furthermore, the Court will consider the matters outside of the pleadings in ruling on Defendants' Motion. Accordingly, the Court will construe Defendants' Motion as one for summary judgment.

### 2.     Rule 56 Standard of Review

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).  The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another."  Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case.  Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)).  Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265.  A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor.  Anderson, 477 U.S. at 248.  If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

### 3.    Analysis

Defendants advance four principal arguments as to why judgment should be entered in their favor: (1) Eleventh Amendment immunity; (2) the statute of limitations bars Hall's claims based on events that occurred before April 9, 2012; (3) there is no dispute of material fact that Hall had and continues to have access to the courts; and (4) qualified immunity.  The Court addresses Defendants' arguments in turn.[16]

### a.    Eleventh Amendment Immunity

Defendants maintain that Corcoran is entitled to Eleventh Amendment immunity for Hall's claims against her in her official capacity for both money damages and injunctive relief.  The Court agrees that Corcoran is immune from suit for monetary damages for the claims against her in her official capacity.  Corcoran is not, however, immune from suit in her official capacity for prospective injunctive relief.

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State."  U.S. Const. amend. XI.  Notwithstanding the Eleventh Amendment's explicit mention of only "Citizens of another State," id., the Supreme Court of the United States

---

[16] Defendants also argue that the Rooker-Feldman doctrine precludes Hall from re-litigating his MPIA claim.  Defendants' argument is misplaced.  Under the Rooker-Feldman doctrine, federal district courts generally do not have jurisdiction to review state-court decisions.  Allstate Ins. Co. v. W. Va. State Bar, 233 F.3d 813, 816 (4th Cir. 2000) (quoting Plyler v. Moore, 129 F.3d 728, 731 (4th Cir. 1997)).  Here, Hall does not ask this Court to review his state-court MPIA claim.  Rather, he uses his MPIA request and related lawsuit as evidence of his inability to access Maryland legal materials.  Thus, the Rooker-Feldman doctrine does not apply.

has construed the Eleventh Amendment as also protecting states from federal court suits brought by the state's own citizens. Lee-Thomas v. Prince George's Cty. Pub. Sch., 666 F.3d 244, 248 (4th Cir. 2012) (quoting Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 304 (1990)). The States' immunity extends to "state agents and state instrumentalities." Id. (quoting Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429 (1997)). This immunity is not absolute, however, as Congress and state legislatures may waive it. Id. at 249 (quoting Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 363, (2001); Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. 613, 618 (2002)).

Under the Eleventh Amendment, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) (internal citation omitted). The State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts. See Md. Code Ann., State Gov't, § 12–201 (West 2018). It has not, however, waived its immunity under the Eleventh Amendment to a suit of this kind. Official-capacity claims, therefore, are subject to Eleventh Amendment immunity. See Kentucky v. Graham, 473 U.S. 159, 167 (1985). Under the Ex parte Young doctrine, however, the Eleventh Amendment does not prevent private individuals from suing state officials under § 1983 for prospective injunctive relief to prevent ongoing violations of federal law. McBurney v. Cuccinelli, 616 F.3d 393, 399 (4th Cir. 2010) (citing Ex parte Young, 209 U.S. 123, 159–60 (1908)).

Here, Hall brings suit against Corcoran in her official capacity and seeks prospective injunctive relief; Hall does not seek money damages. Specifically, Hall requests access to Maryland law materials to aid preparation of his state habeas corpus petition, his post-conviction petition, and lawsuits challenging Maryland's parole procedures and the legality of his incarceration in Virginia. The Court, therefore, concludes that Corcoran is not entitled to Eleventh Amendment immunity. Consequently, the Court will not grant summary judgment in Corcoran's favor on this ground.

### b. Statute of Limitations

Defendants contend that the applicable statute of limitations bars Hall's claims for money damages prior to April 9, 2012. Hall counters that he submitted his MPIA request to Stouffer on March 28, 2013—within the statute of limitations period—and because this action falls within the statute of limitations, the continuing violation doctrine permits Hall to assert claims that accrued outside of the applicable statute of limitations. The Court finds Hall's argument persuasive.

"Section 1983 contains no statute of limitations and, consequently, it has been held that the most analogous state statute of limitations would apply." Duggan v. Town of Ocean City, 516 F.Supp. 1081, 1083 (D.Md. 1981). In Maryland, that statute of limitations is three years. Id. (citing Davidson v. Koerber, 454 F.Supp. 1256 (D.Md. 1978); and then citing McIver v. Russell, 264 F.Supp. 22 (D.Md. 1967)). While Maryland's three-year statute of limitations applies to § 1983 claims, "federal law controls when the statute of limitations [begins] to run." Maisha v. Univ. of N. Carolina,

641 F.App'x 246, 249 (4th Cir. 2016) (citing A Soc'y Without a Name v. Virginia, 655 F.3d 342, 348 (4th Cir. 2011)).  The tort principle of "continuing violation," also known as the "continuing violation doctrine," "is a general principle of federal common law." DePaola v. Clarke, 884 F.3d 481, 486 (4th Cir. 2018).

The continuing violation doctrine holds that "when a harm has occurred more than once in a continuing series of acts or omissions, a plaintiff under certain circumstances may allege a 'continuing violation' for which the statute of limitations runs anew with each violation." DePaola, 884 F.3d at 486; see Heard v. Sheahan, 253 F.3d 316, 318 (7th Cir. 2001) (stating that every day prison officials failed to treat inmate's medical condition "marked a fresh infliction of punishment that caused the statute of limitations to start running anew").  "A violation is called 'continuing' . . . when it would be unreasonable to require or even permit [the plaintiff] to sue separately over every incident of the defendant's unlawful conduct." Tarpley v. Hogan, No. GLR-15-735, 2016 WL 4888914, at *7 (D.Md. Sept. 15, 2016) (alteration in original) (quoting Heard, 253 F.3d at 319), appeal dismissed, No. 16-7379, 2016 WL 9818272 (4th Cir. Dec. 8, 2016).  As a result, the statute of limitations begins to run "from the date of the last incidence of that violation, not the first." Cesal v. Moats, 851 F.3d 714, 722 (7th Cir. 2017) (quoting Turley v. Rednour, 729 F.3d 645, 651 (7th Cir. 2013)).

Defendants maintain that Stouffer's response to Hall's 2009 letter and Stouffer's 2014 response to Hall's MPIA request are separate events, and therefore, the continuing violation doctrine does not apply.  The Court finds Defendants' attempts to portray these events as separate and distinct unpersuasive.

The Fourth Circuit recently held in <u>DePaola</u> that a prisoner may assert a continuing violation under § 1983 for claims of deliberate difference to a serious, ongoing medical need. <u>DePaola</u>, 884 F.3d at 487. In <u>DePaola</u>, a prisoner alleged that prison officials and employees "have (and continue to) violate[ ]" his constitutional rights by acting with deliberate indifference to his physical health needs . . . and his mental health conditions." <u>Id.</u> at 485. Specifically, the prisoner alleged that "he notified several prison officials of his mental illnesses but has received no treatment," that he "has repeatedly attempted to obtain help from" the defendants, and that he "has never received any mental health treatment" while incarcerated. <u>Id.</u> The Fourth Circuit concluded that a prisoner's claim of a continuing violation of his Eighth Amendment rights "may extend back to the time at which the prison officials first learned of the serious medical need and unreasonably failed to act." <u>Id.</u> at 487. Accordingly, the Fourth Circuit set forth a two-prong test for establishing a § 1983 Eighth Amendment deliberate indifference claim under the continuing violation doctrine. <u>Id.</u> The plaintiff must: "(1) identify a series of acts or omissions that demonstrate deliberate indifference to his serious medical need(s); and (2) place one or more of these acts or omissions within the applicable statute of limitations for personal injury." <u>Id.</u>

Although the Fourth Circuit has not applied the continuing violation doctrine to an access to courts claim, the reasoning in <u>DePaola</u> is analogous to this case. Here, Hall has produced evidence of a series of acts or omissions that establish that Stouffer was aware of or should have been aware of Hall's lack of access to Maryland legal materials in 2009 or, at least as early as, 2010. Hall first contacted Stouffer regarding his lack of access to

Maryland legal materials on February 11, 2009. (Hall Decl. ¶ 14; Feb. 11, 2009 Hall Ltr.). Gifford responded on Stouffer's behalf, advising Hall to contact LASI. (Hall Decl. ¶ 15; Mar. 17, 2009 Gifford Ltr.). After receiving a one-sentence response from LASI regarding his request for Maryland legal materials, Hall contacted DLLR, under which LASI operates, and copied Stouffer on the letter detailing the lack of response from LASI and again requesting Maryland legal materials. (Hall Decl. ¶ 18; Decl. 24, 2010 Hall Ltr.). Hall never received a response from Stouffer, nor is there evidence in the record that Stouffer took any other action to address Hall's lack of access to Maryland legal materials.

Hall has also produced evidence that at least one act or omission falls within the limitations period. On March 28, 2013, Hall filed an MPIA request, addressed to Stouffer, again requesting Maryland legal materials. (Hall Decl. ¶ 22; MPIA Req.). Defendants contend that because Stouffer became Warden at Roxbury Correctional Institution ("Roxbury") on October 30, 2013, and there is no record that he received Hall's MPIA request before he left, the MPIA request falls outside of the limitation period. That there is no record that Stouffer received Hall's MPIA request in March 2013 does not rebut Hall's evidence that he submitted one at that time. In fact, Defendants originally maintained that they did not have a record of receiving Hall's MPIA request until July 17, 2014. (Aug. 8, 2014 Seergae Ltr. at 1). Defendants subsequently notified the Court that DOC records reflect that Stouffer received Hall's MPIA request on November 15, 2013—after Stouffer became Warden at Roxbury. (Mekiliesky Decl. ¶¶ 2–3).

Further, Hall's ongoing injuries of the inability to file a post-conviction petition, a state habeas petition, or civil rights actions are not readily divisible into separate lawsuits. It would, therefore, be "unreasonable" to require Hall to sue Stouffer separately for the 2009, 2010, and 2013 failures to address Hall's requests for Maryland legal materials. See Tarpley, 2016 WL 4888914, at *7 (quoting Heard, 253 F.3d at 319).

Defendants alternatively maintain that even if Gifford's 2009 response to Hall and 2010 lack of response to Hall's letter in which he copied Stouffer are violations of Hall's First Amendment rights, the continuing violation doctrine does not apply to these acts because no acts attributable to Stouffer occurred during the limitations period. Defendants ignore the fact that the Hall's 2009 letter was addressed to Stouffer and that Gifford responded to it "on his behalf," (Mar. 17, 2009 Gifford Ltr.; Miller Decl. ¶ 2) (emphasis added), making it an act attributable to Stouffer. As to Hall's 2010 letter, Defendants overlook the fact that the continuing violation doctrine encompasses acts or omissions, i.e., failures to act. See DePaola, 884 F.3d at 487. Hall copied Stouffer on his 2010 letter to DLLR about his continued lack of access to legal materials, despite contacting LASI for those materials as Stouffer's staff member directed. (Dec. 24, 2010 Hall Ltr. at 2). Stouffer's failure to respond to the letter, have one of his staff respond on his behalf, or otherwise take action to ensure that Hall had access to adequate Maryland legal materials may be characterized as an omission attributable to Stouffer.

In short, the Court concludes that Hall has put forth sufficient evidence to establish a continuing violation. As a result, the Court further concludes that the statute of limitations does not bar Hall's claims for monetary relief based on Stouffer's acts or

omissions prior to April 9, 2012.  Accordingly, the Court will deny Defendants' Motion on this ground.  The Court next addresses the substance of Hall's access to the courts claim.

### c.  First and Fourteenth Amendment Access to the Courts Claim

Defendants raise two main arguments for entering judgment in their favor on Hall's access to courts claim.  First, Defendants argue that Hall fails to establish that he has been denied and is being denied access to the courts.  Second, Defendants maintain that Hall fails to establish Stouffer's supervisory liability.

### i.  Denial of Access to the Courts

Under the First Amendment and Due Process Clause of the Fourteenth Amendment to the United States Constitution, prisoners have a right of access to the courts.  See Giarratano v. Johnson, 521 F.3d 298, 305 (4th Cir. 2008).  To ensure this right is not violated, states must "furnish 'adequate law libraries or adequate assistance from persons trained in the law.'"  Lewis v. Casey, 518 U.S. 343, 356 (1996) (quoting Bounds v. Smith, 430 U.S. 817, 828 (1977)).  "[M]eaningful access to the courts is the touchstone" of this right.  Id. at 351 (emphasis added) (quoting Bounds, 430 U.S. at 823).  To establish a constitutional claim for denial of access to the courts, a prisoner must show that the deficiencies in a prison's law library or legal assistance program: (1) hindered his efforts to pursue a nonfrivolous legal claim; and (2) actual injury.  Id. at 349, 351.

The Court first addresses whether there are deficiencies in the law library and legal assistance provided to Hall, and then addresses whether Hall establishes a lack of access to courts claim under the two-prong test.

### aa.    Legal materials and legal assistance

Defendants first maintain that Hall had access to Maryland legal materials through either LASI or Prisoner Rights Information System of Maryland, Inc. ("PRISM") and that he was assigned an OPD attorney.  As a result, Defendants contend, there were no deficiencies in Maryland's law library or legal assistance program.  Defendants mistakenly focus on Maryland's provision of legal materials and assistance generally, instead of focusing on the specific facts of Hall's case.

Here, Defendants fail to produce evidence that Hall received a copy of the Handbook or the LASI request form contained therein, despite specific requests from the Court to do so.  The evidence in the record reflects that Hall requested legal materials from LASI, and received an unsigned, one-sentence letter in response denying his request because it would violate copyright laws.  The letter did not inform Hall of the proper procedures for or scope of LASI requests, and Hall never received the materials he requested.  As for PRISM, Defendants aver that PRISM received correspondence from Hall in 2009 and 2015.  (Meehan Decl. ¶ 2, ECF No. 41-11).  Defendants do not, however, provide copies of Hall's correspondence or PRISM's responses, if any.  Thus, the Court cannot assess whether the information Hall received from PRISM, if any, satisfied Defendants' obligation to provide Hall an adequate law library.

Finally, while it is true that as early as 2008 Hall was assigned an OPD attorney to aid him in pursuing post-conviction relief, the evidence in the record demonstrates that he did not, and is not, receiving meaningful assistance from his assigned attorney. Indeed, Hall did not receive any correspondence from his attorney for over seven years. Only when Hall filed this case did Handwerger contact him regarding potentially filing a petition for post-conviction relief. (Hall Decl. ¶ 42; Sept. 13, 2017 Handwerger Ltr.). Since Handwerger's September 2017 letter, there is no evidence in the record that Handwerger met with Hall to discuss his post-conviction case, or filed a petition for post-conviction relief on Hall's behalf. Thus, the Court cannot say, based on the record before it, that Hall had or presently has meaningful access to the courts. Lewis, 518 U.S. at 351 (quoting Bounds, 430 U.S. at 823).

### bb. Hindered efforts to pursue legal claims

The universe of nonfrivolous legal claims encompasses direct appeals from convictions for which an inmate is incarcerated, habeas petitions, and civil rights actions under § 1983. Id. at 354. Here, Hall's lack of access to Maryland legal materials or legal assistance has resulted in his inability to file a petition for post-conviction relief, a petition for state habeas corpus, or civil rights lawsuits—i.e., nonfrivolous legal claims. Nevertheless, Defendants argue that because Hall: (1) has not filed a petition for post-conviction relief; (2) could file a state habeas petition; and (3) does not allege that he has been denied access to materials regarding federal habeas relief, or that he is time-barred from seeking federal habeas relief, he fails to establish a genuine dispute of material fact

regarding a violation of his constitutional right of access to the courts. The Court rejects Defendants' arguments for at least two reasons.

First, Hall not filing a petition for post-conviction relief in his criminal case or a state habeas petition supports his allegations that he has been hindered in pursuing his legal claims. Indeed, the evidence in the record demonstrates that Hall has repeatedly contacted Maryland and Virginia prison officials and Maryland state agencies seeking the laws and statutes governing post-conviction relief and state habeas petitions, but has received either nothing in response or no response at all. Second, that Hall has does not assert that he cannot file a federal habeas petition does not change the fact that he has been hindered in his efforts to pursue post-conviction and habeas relief in state court. In fact, before pursuing a petition for federal habeas corpus, an individual that is incarcerated as a result of a state-court conviction must exhaust all available state remedies. 28 U.S.C. § 2254 (b)(1)(A) (2018). Hall, therefore, cannot pursue federal habeas relief until he fully exhausts avenues for state habeas relief. Thus, Hall's failure to establish that he does not have access to legal materials concerning federal habeas is of no consequence.

In short, Hall has created a genuine dispute of material fact as to whether his lack of access to Maryland legal materials or legal assistance has hindered his ability to pursue nonfrivolous legal claims.

### cc. Actual injury

To make a showing of actual injury, the prisoner must demonstrate that "the alleged shortcomings in the library or legal assistance program hindered his efforts to

pursue a legal claim." <u>Lewis</u>, 518 U.S. at 351. A prisoner can establish actual injury by, for example, showing that "he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint." <u>Id.</u> Put another way, if an inmate establishes that a nonfrivolous legal claim that he wished to pursue has been "lost or rejected," or that "the presentation of such a claim is currently being prevented," because of inadequacies in a law library and legal assistance, he sufficiently demonstrates actual injury. <u>Id.</u> at 356 (quoting <u>Bounds</u>, 430 U.S. at 828).

The Fourth Circuit has stated, in dicta, that "injury may be presumed where a total denial of access to a law library or legal assistance is alleged." <u>Strickler v. Waters</u>, 989 F.2d 1375, 1385 n.16 (4th Cir. 1993) (listing cases); <u>see also</u> <u>DeMallory v. Cullen</u>, 855 F.2d 442, 449 (7th Cir. 1988) ("In essence, when an inmate complains of prison rules that substantially and continuously limit his or her access to legal materials and counseling, the complaint carries an inherent allegation of prejudice."); <u>Harris v. Young</u>, 718 F.2d 620, 622 (4th Cir. 1983) ("Because an inmate is unable to discover his rights when library access or other access is denied him, any complaint rightly alleging a present denial of access to a library or other assistance states a valid claim for equitable relief.").

Here, based on the record before the Court, it is clear that a genuine dispute of material fact exists regarding whether Hall has suffered prejudice as a result of his lack of access to Maryland legal materials or legal assistance. Although the Court does not need to presume prejudice in this case, the Court may nonetheless do so as Hall presently does not have access to Maryland legal materials or legal assistance. <u>See</u> <u>Harris</u>, 718 F.2d at

622. In addition, Hall creates a genuine dispute of material fact regarding whether he has suffered actual prejudice. Hall has put forth evidence that due to his complete lack of access to Maryland legal materials or legal assistance, he has been prevented and is currently being prevented from filing a post-conviction petition, a state habeas petition, and civil rights actions. The Court acknowledges that Hall recently received correspondence from the OPD attorney assigned to his post-conviction case, but there is no evidence in the record that Handwerger met with Hall to discuss his case or otherwise advised him regarding post-conviction relief. In short, Hall still does not have legal assistance or legal materials to pursue his nonfrivolous post-conviction petition. Thus, there exists a genuine dispute of material fact as to whether Hall has suffered actual prejudice.

### ii. Supervisory Liability

There is no respondeat superior liability under 42 U.S.C. § 1983. Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004). Thus, "for an individual to be liable under § 1983, it must be affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." Makdessi v. Fields, 789 F.3d 126, 144 (4th Cir. 2015) (quoting Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985)). It is well-settled, however, that "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001) (quoting Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994)). Supervisory liability "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of

subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" Id. (quoting Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984)). To establish supervisory liability, a plaintiff must demonstrate:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices [ ]; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Id. (alteration in original) (quoting Shaw, 13 F.3d at 799).

Defendants contend that Hall fails to establish the first element of supervisory liability because he does not provide evidence that the risk of constitutional injury is "widespread." (Defs.' Mot. at 28). While this is one way of establishing the knowledge prong of the test, it is also sufficient to show that the conduct "at least has been used on several different occasions." Shaw, 13 F.3d at 799 (quoting Slakan, 737 F.2d at 373–74). Defendants also maintain that Stouffer cannot be held liable because his administrative staff handled all incoming inmate mail and he "did not encounter inmate mail unless a response was prepared for his signature." (Defs.' Reply at 2–3, ECF No. 41).

Here, Hall has put forth evidence which establishes that on at least three occasions he sent correspondence to or otherwise contacted Stouffer to inform him that he did not have access to Maryland legal materials in Virginia, and to request such materials. In each instance, either Stouffer did not respond, or his administrative staff responded, but Hall never received any legal materials or assistance. Gifford's response in 2009,

Seergae's response in 2014, and Stouffer's failure to respond when made aware that Hall still did not have access to Maryland legal materials in 2010 are sufficient to create a genuine dispute of material fact that "on several different occasions" Stouffer's responses to Hall's requests were inadequate. See Shaw, 13 F.3d at 799 (quoting Slakan, 737 F.2d at 373–74).[17]

Further, that Stouffer did not review inmate mail unless a response was prepared for him to sign supports a claim that he was deliberately indifferent to the risk of violating Hall's constitutional rights. Stouffer attempts to shift the blame to his administrative staff by asserting that they were responsible for preparing responses on his behalf. The Court is not persuaded. Stouffer was responsible for ensuring Hall's issues were addressed, yet the evidence in the record indicates that he did nothing to ensure that his administrative staff addressed them. This may demonstrate either deliberate indifference to or tacit authorization of his subordinates' conduct. See Baynard, 268 F.3d at 235 (quoting Shaw, 13 F.3d at 798).

In sum, the Court concludes that there are genuine disputes of material fact regarding Hall's access to the courts claim. Accordingly, the Court will deny Defendants' Motion on this ground.

---

[17] Defendants assert that the Inmate Correspondence Manager Database, the computer database in which Stouffer's administrative staff logged all inmate correspondence, does not contain an entry for Hall's December 24, 2010 letter. (Miller Decl. ¶ 2). Hall, however, avers that he sent the letter and produces a copy of the letter. (Hall Decl. ¶ 18; Dec. 24, 2010 Hall Ltr.). Accordingly, viewing the evidence in a light most favorable to Hall, the Court concludes that there exists a genuine dispute of material fact regarding whether Stouffer indeed received a copy of the letter.

### d. Qualified Immunity

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). There is a two-prong test for determining whether a government official is protected by qualified immunity: (1) whether the facts that the plaintiff has alleged or shown make out a violation of a constitutional right; and (2) whether that right was "clearly established" at the time of the purported violation. Pearson v. Callahan, 555 U.S. 223, 232 (2009) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). Courts have discretion to resolve these two prongs in whatever order they consider appropriate based on the circumstances of the case at hand. Id. at 236. The answers to both prongs must be in the affirmative for a plaintiff to defeat a motion for summary judgment on qualified immunity grounds. Batten v. Gomez, 324 F.3d 288, 293–94 (4th Cir. 2003). The plaintiff bears the burden of proof on the first prong, Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir. 1993); the defendant on the second, Wilson v. Kittoe, 337 F.3d 392, 397 (4th Cir. 2003).

Defendants maintain that they are entitled to qualified immunity for Hall's claims against them. At bottom, the Court concludes that Corcoran is not protected by qualified immunity because Hall sues her in her official capacity. The Court also concludes that a qualified immunity determination as to the claims against Stouffer would be premature at this time. The Court considers each Defendant in turn.

### i. Corcoran

A government official sued in her personal, or individual, capacity may invoke qualified immunity.  Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006).  Qualified immunity "is not available in an official-capacity suit brought against a government entity or a government officer as that entity's agent."  Id.  Here, because Hall sues Corcoran only in her official capacity, she is not entitled to qualified immunity.  The Court will, therefore, deny Defendants' Motion on this ground as to Corcoran.

### ii. Stouffer

By contrast, Hall sues Stouffer in his individual capacity.  Because the first prong of the qualified immunity analysis is genuinely disputed, the Court proceeds to the second prong.  See Batten, 324 F.3d at 293–94.  This prong comprises a three-step process.  First, the court identifies "the specific constitutional right allegedly violated." Collinson v. Gott, 895 F.2d 994, 998 (4th Cir. 1990).  Second, the court inquires whether at the time of the alleged violation, that right was "clearly established."  Id.  Third, the court inquires "whether a reasonable person in the official's position would have known that his conduct would violate that right."  Id.; see Cloaninger v. McDevitt, 555 F.3d 324, 331 (4th Cir. 2009) (explaining that a right is "clearly established" when "it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted" (quoting Saucier, 533 U.S. at 202)).

The first two steps in this process present pure questions of law for the courts. Collinson, 895 F.2d at 998.  The third step "may sometimes require factual

determinations respecting a defendant's conduct and its circumstances," but the ultimate application of the objective analysis in the third step "is also a matter of law for the court." Id.; see Willingham v. Crooke, 412 F.3d 553, 560 (4th Cir. 2005) ("[W]e hold that the legal question of a defendant's entitlement to qualified immunity under a particular set of facts should be decided by the court, not by the jury.").

The third step in this process, the "reasonableness inquiry," "turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" Pearson, 555 U.S. at 244 (quoting Wilson v. Layne, 526 U.S. 603, 614 (1999)). The operation of the reasonableness inquiry "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. 635, 639 (1987). The Supreme Court has instructed that the right an official is alleged, or proven, to have violated must have been "clearly established" in a highly particularized sense: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 640. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Id. (internal citation omitted). Put another way, to be "clearly established" "there is no need that 'the very action in question [have] previously been held unlawful.'" Safford Unified Sch. Dist. #1 v. Redding, 557 U.S. 364, 377 (2009) (alteration in original) (quoting Wilson v. Layne, 526 U.S. 603, 615 (1999)). Indeed, "officials can still be on notice that their conduct violates established law . . . in novel

factual circumstances." Id. at 377–78 (alteration in original) (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)).

Stouffer, in essence, argues that Hall fails to establish the second and third prongs. The Court disagrees as to the second prong and concludes, based on the current record, that it would be premature to determine whether Stouffer's conduct was objectively reasonable under the third prong.

With regard to the second prong, the right of prisoners' access to the courts was clearly established at the time Stouffer allegedly violated Hall's rights in this regard. As the Supreme Court explained in Lewis, "[t]he right that Bounds acknowledged was the (already well-established) right of access to the courts." 518 U.S. at 350 (emphasis in original). At minimum, Bounds clearly established that a prisoner is entitled to a law library or legal assistance, and the Supreme Court reiterated this right in Lewis. Indeed, prior to Lewis, in Carter v. Kamka, this Court addressed whether the Maryland's Prisoners Assistance Project ("PAP") satisfied Maryland inmates' right of access to the courts. 515 F.Supp. 825, 831 (D.Md. 1980). The Carter court explained that "the State of Maryland has the alternative of providing such access to the courts by means of 'adequate law libraries or adequate assistance from persons trained in the law.'" Id. (quoting Bounds, 430 U.S. at 828). At the very least, therefore, Hall was entitled to either a law library with Maryland legal materials that would assist him in pursuing his post nonfrivolous legal claims, or legal assistance that functioned in a similar manner. As discussed above, on the present record before the Court, there is evidence of neither.

With regard to the third prong, the evidence in the record regarding Stouffer's role in responding to Hall's requests for Maryland legal materials is lacking. Stouffer points to the fact that his employees handled all of his correspondence, and he only saw responses to correspondence when they required his signature. But, as addressed above, attempting to shift the blame to his subordinates for inadequately responding to Hall's requests—and in one instance, not responding at all—does not relieve Stouffer of the responsibility of ensuring that inmates in DOC custody have access to the courts.

Likewise, Defendants first asserted that Stouffer's administrative staff did not receive Hall's March 28, 2013 MPIA request until August 8, 2014. Defendants then filed supplemental information with the Court—after their Motion was fully briefed—which contained evidence that Stouffer's administrative staff processed the letter on November 15, 2013. That Hall sent the letter in March 2013 and that there was no evidence that it was processed until November 2013—nearly eight months later—at the very least presents a genuine dispute of material fact regarding whether this conduct was objectively reasonable, especially in light of Hall's previous correspondence requesting Maryland legal materials. Further, Stouffer did not produce evidence regarding how his administrative staff handled his mail until his Reply brief on his third Motion for Summary Judgment, and presented further evidence of when he received Hall's correspondence after this Motion was fully briefed. Thus, further factual development of the record would be helpful to establish the precise contours of Stouffer's and his administrative staff's actions—or failures to act—to address Hall's lack of access to the Maryland legal materials or legal assistance. Thus, the Court concludes, based on the

present record, that there is a genuine dispute of material fact as to whether Stouffer is entitled to qualified immunity.

In sum, Corcoran cannot invoke qualified immunity because Hall sues her in her official capacity, and the Court does not have sufficient information to determine whether Stouffer is entitled to qualified immunity at this time. Accordingly, the Court will deny Defendants' Motion on this ground as to Corcoran and deny without prejudice Defendants' Motion on this ground as to Stouffer.[18]

### III.    CONCLUSION

For the foregoing reasons, the Court will deny in part and deny without prejudice in part Stouffer and Corcoran's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 33), construed as a motion for summary judgment. The Court will also grant in part and deny in part Hall's Motion for Leave to File Surreply in

---

[18] Defendants also maintain that Hall is not entitled to permanent injunctive relief. While the Court is not determining the form the relief in this case will take, if any, at this time, the Court does not find Defendants' argument persuasive. Defendants assert concerns over the Court interfering with "prison management" and "institutional security" and invoke "legitimate penological concerns" for deferring to prison managements' decisions. (Defs.' Mot. at 13). If the Court were to order permanent injunctive relief, however, it could merely order Corcoran to follow the policies and procedures that are already in place to ensure prisoners' constitutional right of access to the courts is not violated. Further, the Court is confident that it can fashion injunctive relief that "extend[s] no further than necessary" to correct the purported violation as required by the Prison Litigation Reform Act. 18 U.S.C. § 3626(a)(1)(A) (2018).

Opposition to Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary

Judgment (ECF No. 42). A separate order follows.

Entered this 25th day of September, 2018

_____/s/_____
George L. Russell, III
United States District Judge